**WILKER BROTHERS COMPANY, INC., Plaintiff,**

v.

**LUMBERMANS MUTUAL CASUALTY COMPANY, Defendant.**

No. 80 Civ. 6218–CLB.

United States District Court, S. D. New York.

Oct. 26, 1981.

Tell, Cheser, Breitbart & Lefkowitz, New York City, for plaintiff; Leslie Kirsch, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; Donald F. Connors and Donald T. Rave, Jr., New York City, of counsel.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiff in this diversity action seeks to recover the sum of $107,421.30 under a policy of insurance for loss of 1,990 dozen pairs of pajamas, in Nicaragua. Under circumstances detailed below, both parties seek summary judgment.

Plaintiff (hereinafter sometimes "Wilker") is a New York corporation which was engaged in the importation of pajamas to the United States, manufactured wholly or partly at the 10,000 square foot plant of Vestidos, S.A., a Nicaraguan corporation located at San Marcos, Nicaragua. San Marcos is near the Pacific Ocean coast of Nicaragua. It is located about 42 miles from Managua, the capital of Nicaragua and center of the recent political turmoil discussed below.

The stock of Vestidos, in turn was owned one-half by principals and officers of plaintiff, and the remainder by three designees of General Anastasio Somoza Debayle ("General Somoza"), the Chief of State of Nicaragua until his resignation and flight on July 18, 1979.

The change of administration in Nicaragua occurred as a result of a civil war or insurrection, as a result of which the Sandinistas, with a little help from their friends (in Washington, D. C. and elsewhere) procured the overthrow of the government after a considerable amount of civil commotion and street fighting.

At some time thereafter, the new Nicaraguan Sandinista government nationalized General Somoza's private financial interests. It now owns 50% of Vestidos and controls the business, which is now inactive.

In early 1979 Wilker began shipping cut pieces of pajamas to Vestidos at San Marcos, Nicaragua, to be sewn into finished garments by the cheaper Nicaraguan labor there available, and thereafter to be reshipped to the United States for sale here. Ownership and title of these goods remained at all times in Wilker.

Wilker obtained a traditional open marine cargo policy of insurance from defendant to cover the value of plaintiff's goods during their movement from the United States to Nicaragua, during the return journey, and while the goods were sojourning at the Vestidos plant for purposes of processing or being held for return shipment.

On November 12, 1979 defendant received a written notice dated November 7, 1979 from Wilker's insurance broker, that on July 31, 1979 a "theft occurred at insured's plant." By a subsequent letter, the broker advised that the loss was not a theft, but was the result of looting by a mob of local citizens on July 30, 1979.

Although claiming that the loss was reported four months late, defendant agreed to investigate the claim under a full reservation of rights. It retained a marine surveyor who made an inquiry or investigation in Nicaragua to the best of his ability to ascertain the circumstances of the loss. Plaintiff and its officers wisely remained out of Nicaragua. In view of ongoing incidents in Iran, it doubted the ability of the American government to protect life and liberty anywhere overseas, and feared that the Sandinistas or the local people might confuse plaintiff's representatives with representatives of the hated Chief of State Somoza.

It is undisputed that the Vestidos factory had been closed from early June 1979 until the new government in Nicaragua permitted it to reopen during October 1979. The revolutionary government prohibited representatives of Wilker or Vestidos from visiting their plant until September 1979, at which time it was under the control of armed representatives of the revolutionary government, which thereafter nationalized the 50% Somoza ownership in Vestidos.

The local Sandanista government authorities at San Marcos furnished an official certificate that the Vestidos plant had been looted on or about July 5th, not July 31st, during and as a result of the "War of Liberation." These authorities also mentioned the fact that General Somoza's ownership interest in the plant motivated the good citizens of San Marcos to satisfy their need for pajamas at plaintiff's expense.

Defendant denied Wilker's claim on the ground that the alleged loss was a consequence of civil war, revolution, rebellion, insurrection or civil strife arising therefrom, all perils excluded under the policy.

Although both parties seek summary judgment, each raises the specter of "genuine disputed issues of fact." There seems to be little that a trial could add to the record already before this Court. Plaintiff has the burden here to show that the loss was within those perils insured against, reading the policy as an entirety, including the exclusion clauses. At a trial plaintiff cannot prove any additional facts, and will know no more than it knows today.

■ All of the available evidence points overwhelmingly to the conclusion that Wilker's loss was a consequence of "civil war, revolution, rebellion, insurrection or civil strife arising therefrom," terms of art well known to the Court, the insurance industry and the business community, for over a century.

Judge Milton Pollack of this Court rendered a recent opinion in *Ope Shipping Ltd. v. Allstate Insurance Company, Inc.*, 79 Civ. 5225, dated August 31, 1981, not yet officially reported. Familiarity with Judge Pollack's opinion is assumed. As the facts relied upon by Judge Pollack are facts of a historical nature, of which a court may take judicial notice under Rule 201, F.R.Evid. there appears to be no need to relitigate the issues in this lawsuit. As Judge Pollack pointed out (Opinion, p. 5):

"1. A so-called Sandinista National Liberation Front undertook activities during 1978 to oust General Somoza; he refused to resign.

2. There was civil strife during most of 1978 in Nicaragua seeking Somoza's resignation, continuing into 1979.

3. On June 1, 1979 a communique to Nicaraguans broadcast by Sandinistas from Costa Rica announced that 'The hour for overthrow of President Somoza has arrived' and in connection therewith the Sandinistas called a nationwide (Nicaraguan) strike beginning June 4, 1979 with insurrection to follow soon after.

4. On June 4, 1979 Nicaraguans began the general strike aimed at deposing Somoza called by the Sandinist National Liberation Front. Cities not under fire were paralyzed by the general strike aimed at overthrowing Somoza.

5. On June 7, 1979 President Somoza declared a state of seige to help combat the general strike and guerilla war.

6. June 14, 1979 Americans were evacuated from Managua to Panama.

7. June 18, 1979 the Sandinistas name[d] a provisional government of five leaders (a Junta).

8. June 22, 1979, American Department of State Secretary Cyrus Vance, at an emergency meeting of the Organization of American States calls for replacement of the Somoza regime; Panama recognizes the provisional government named by the Sandinistas.

9. June 24, 1979, the Organization of American States calls for the immediate and definitive replacement in Nicaragua for President Somoza's regime.

10. July 5, 1979, Somoza has agreed in principle to step down and to go into exile.

11. July 8, 1979, Somoza is negotiating with the provisional Junta; meets Liberal Party leaders and his Cabinet and informs them for the first time of his decision to resign.

\* \* \* \* \* \*

12. July 10, 1979, five member Junta calls itself the Nicaraguan Government of National Reconstruction.

13. July 18, 1979, Somoza resigns and flies to Miami, Florida.

14. July 20, 1979, the Sandinistas take control of Nicaragua completing the defeat of National Guard and ending the seven week old war (more than 10,000 people dead). The new government expropriates the entire business empire of Somoza.

15. July 24, 1979, the Revolutionary Government announces that it will extradite Somoza and his family and seek recovery of their illicit enrichment."

As Judge Pollack also noted in his aforementioned Opinion: "The relevant history of the civil war during that period is also chronicled (in part) in *Productos Carmic, S. A. v. Central Am. Beef and Seafood Trdg. Co.*, 621 F.2d 683 (5th Cir. 1980), a litigation concerning a confiscated Somoza asset." That court found (at p. 685):

"Insurrection, armed conflict, battles in the street, terrorist attacks, riots, war, revolution, and the overthrow of a dictator permeate this appeal. General Anastasio Somoza was forced to resign as President of Nicaragua on July 17, 1979. The new government promptly nationalized a great portion of the vast holdings of Somoza and his family, including a small Nicaraguan meat processing company—already close to bankruptcy—Productos Carnic, S.A."

In *Ope Shipping* the crews of merchant vessels owned by Somoza committed barratry in aid of the Nicaraguan revolution. Here in this case, all evidence available to any party and everything before the Court, points to a conclusion that a local mob sacked and pillaged the Vestidos factory, during July, before the conclusion of the "civil war, revolution, rebellion, insurrection or civil strife arising therefrom," and the mob acted because of its belief that the factory in which plaintiff's goods were located, was owned by General Somoza, against whom the mob sought to wreak its vengeance. That the mob would not distinguish between a factory half owned by the Chief of State and the goods in the factory, entirely owned by Americans, and would vandalize both the goods and the factory, is certainly foreseeable.

The factual situation here is exactly the sort for which the exclusionary clause (referred to as "free from capture and seizure warranty") was traditionally used and intended to exclude insurance coverage. That excluding clause or warranty in this policy reads in relevant part as follows:

"Notwithstanding anything herein contained to the contrary, this insurance is warranted free from capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise; ... also warranted free from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, rockets or similar missiles or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purposes of this warranty 'power' includes any authorized maintaining naval, military or air forces in association with a power. Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy."

As noted in *Pan American World Airways, Inc. v. Aetna Casualty and Surety Company*, 505 F.2d 989, 1017 (2d Cir. 1974), the terms in the clause are to be defined as follows:

" 'Insurrection' presents the key issue because 'rebellion', 'revolution', and 'civil war' are progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.' "
"An insurrection is 'a movement accompanied by actions specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof ... if the insurrection or rebellion proceeds to the attainment of its objective, viz., the overthrow of the old constituted government and the establishment of a new one in its place, then the movement, retroactively will be dignified by the characterization of a 'revolution.' " *Home Insurance Co. of New York v. Davila*, 212 F.2d 731, 736 (2d Cir. 1954), cited in *Ope Shipping, supra*.

The insuring clause of the policy in this case provided that the property was insured "against all risks of physical loss or damage to the property insured from any external cause, irrespective of percentage, excluding, nevertheless, all risks of loss or damage excluded by the F. C. & S. [Free from Capture and Seizure] Warranty or the Strikes, Riots and Civil Commotions Warranty ...." As the policy stood at the time of the events, the Strikes, Riots and Civil Commotions Warranty in the policy, as amended January 19, 1972, read in relevant part as follows:

"This insurance also covers damage, theft, pilferage, breakage or destruction of the property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions and destruction of or damage to the property directly caused by persons acting maliciously.

*       *       *       *       *       *

Nothing in this endorsement shall be construed to include or cover any loss, damage, deterioration or expense caused by or resulting from:

*       *       *       *       *       *

d. hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, excepting only the acts of certain agents expressly covered above."

We turn now to the uncontroverted evidence available at a trial. The official certificate of the Municipal Council of San Marcos, by Ernest Oriega Calero, attached to the affidavit of William A. Price, docketed July 14, 1981, as translated reads in relevant part as follows:

"San Marcos was liberated from the Somoza Genocide Guard on July 5, 1979 and our glorious people wished to be finished with everything associated with Somoza, because at that time we were in a war of liberation and as the Dictator was a partner of Fabrica Vestidos, S.A. the people of San Marcos and the neighboring towns concentrated there wanting to burn it and at night people began looting the articles which were in the warehouse, going so far one day as to force the doors and remove the articles and at that time there were no legally constituted authorities since were were engaged in a war of liberation; upon seeing that looting was taking place, a group of citizens formed a committee to protect the machines and the entire infrastructure of said factory, and to prevent the crowd from rushing the factory and removing all the machines and dismantling the infrastructure, as happened in other cities, the few pajamas remaining had to be given away, since no one in charge of this factory was present to protect it since the conditions at that time did not permit these people to appear; if they had appeared it would have been fatal for them."

As appears from the foregoing, there is some dispute as to whether this factory was looted on July 31st, as claimed by plaintiff, or on July 5th, as indicated by documentation supplied by the Sandinistas, quoted above. On July 19, 1979, hostilities in Nicaragua were terminated. This was preceded by a cease-fire, during which General Somoza resigned the presidency and left the country. President Carter attorned to the Sandinistas on July 29, 1979 by ordering the United States Ambassador to return to Managua on that date (a Saturday) and directing him to present his credentials to the new government, "early next week." See State Department public announcement made July 27, 1979. However, simply because one side in a civil war has captured the capital city does not mean that the entire country automatically reverts immediately to a state of peaceful order and tranquility (Affidavit of Donald F. Connors, docketed July 14, 1981).

Under date of December 20, 1979, Jorge Sas Zatwarnicki, General Manager of Vestidos, wrote to Wilker at New York in relevant part as follows:

"Complying with your request, I inform you about the events occurred after the end of the insurrection in the month of July.

I return to the country the first days of August and I started the contacts with officials of the new government to negotiate the situation of the company. During this time I was not allowed to enter the factory, however I made contacts with the general supervisor of the plant Melania Fernandez and I heard from her that on July 31st people forced the door of the plant and took some things, but she did not know the damage.

On September I received permission to go into the plant to see the conditions of it and I realized that the door had been forced and inside I saw the empty tables of the pressing, examining and folding sections, and that a big amount of cartons with finished pajamas packed were missing. .... Then I went to the police of San Marcos ... and reported that the factory had been robbed."

Mr. Zatwarnicki's report shows that in October he received "the total authorization of the government to take again the complete responsibility of the company, and I could make an inventory of the goods missing, which I delivered to you, and on the second week of October I started the operations of the factory."

The proof of loss claims refer to the loss as "by looting." The Court does not regard the conflict over dates as presenting a significant factual issue. The looting of Vestidos, whether it occurred before or shortly after the establishment of the new government in the national capital, some 40 miles away was still, by all of the evidence presented to this Court, in furtherance of the Revolution, and is the sort of incident which is clearly within the exclusionary clauses, previously quoted, found in the insurance policy issued by this defendant.

Melania Fernandez, whose statement is relied upon in the letter from Mr. Zatwarnicki, made her own statement, which discloses that she was not in San Marcos at the time, and did not personally witness the looting. She returned on August 14, 1979 and realized that the factory had been looted. Her statement shows that the factory was closed on June 30, 1979, a Saturday, and remained closed thereafter. She left San Marcos on that day and did not return until August 14th. Mrs. Fernandez was the first person to enter the factory after the Revolution. She did so by asking "the wife of a member of the Local Government Board" for the key.

The totality of the submissions on this motion make it clear that the principals of Vestidos, including Wilker, were prevented from entering their factory or exercising dominion and control over the property, between June 30th when they voluntarily closed it in anticipation of the troubles, and August 14th when Mrs. Fernandez obtained the key from a member of the Local Government Board and entered the plant. Indeed, the local officials withheld dominion of the property from Zatwarnicki until September or October, while the "militia" was guarding the plant.

The conclusion is inescapable that control of these premises during that period by the new government, or the revolutionaries, constituted a seizure and restraint from the time when the civil war, revolution, insurrection and civil strife arising therefrom subsided at San Marcos, whatever date that may have been, at least until plaintiff's agent was allowed to retake the plant. As noted before, peace in the capital city on July 20th does not necessarily preclude riotous interference with plaintiff's property in San Marcos on July 31st.[1]

Viewed most favorably to plaintiff and assuming that the looting occurred on July 31st as claimed by the plaintiff, rather than on July 5th, as attested to under seal by the local officials, a fact which this Court doubts could be proved at trial, the cause of the loss in any event was excluded from the perils insured against. The Court agrees with defendant that the loss of the insured goods occurred either as a direct consequence of the civil war, revolution, rebellion, insurrection or civil strife arising therefrom, or, if not this, the loss occurred by reason of the seizure and restraint of the plant by the Sandinista government, an alternative basis for exclusion from coverage upon which the insurer could rely.

This being so, defendant's motion must be and it hereby is granted, and plaintiff's motion is denied.

The Court concludes that there is no substance to defendant's alternative claim of delay; no surveyor could look into the loss until after permission had been received from the new government, and this was apparently not forthcoming officially until September or October, when Wilker's representatives were able to enter the Vestidos factory, of which it was and is part owner. While Melania Fernandez entered the plant in August, her entry was effected clandestinely. The insurer was not prejudiced by any delay, and the delay was not unreasonable.

The Clerk shall enter a final judgment that all relief shall be denied.

So Ordered.

---

1. Probably not admissible at trial, but of passing interest, is the fact that Vestidos, S.A. filed a claim with its own Nicaraguan insurer for losses due to sacking and pillage of its plant during the last week of July, 1979. Its claim was declined by that insurer, presumed to be familiar with local history, as having occurred "during the warlike events of June and July of the present year," and therefore excluded from coverage because "indirectly—caused by hostilities—or by civil war, revolution, rebellion, sedition, insurrection, military, conspiracy, terrorism, usurpation of power or nationalization, expropriation, seizure, confiscation or requisition by detention by any civil or military power, whether lawful or usurped."