The **SHERWIN–WILLIAMS COMPANY**, Plaintiff,

v.

The **INSURANCE COMPANY OF the STATE of PENNSYLVANIA**, Defendant.

No. 1:91CV0250.

United States District Court, N.D. Ohio, Eastern Division.

July 7, 1994.

Paul J. Schumacher, Jr., John B. Robertson, Gallagher, Sharp, Fulton & Norman, John W. Lebold, Sherwin–Williams Co., Cleveland, OH, for plaintiff.

Mark P. O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Donald Paul Screen, Thompson, Hine & Flory, Cleveland, OH, James L. Carroll, Watkins & Eager, Jackson, MS, for defendant.

***MEMORANDUM OF OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT***

WELLS, District Judge.

This case is before this Court on the cross-motions for summary judgment filed by

plaintiff, The Sherwin–Williams Company, and defendant, the Insurance Company of the State of Pennsylvania ("ISOP").

The Court referred the parties' motions to United States Magistrate Judge Patricia A. Hemann for a report and recommended decision. Magistrate Judge Hemann has submitted a report and recommended decision, recommending that the Court enter a declaratory judgment in favor of Sherwin–Williams. ISOP has objected to the Magistrate Judge's report and recommendation; Sherwin–Williams has responded to the objections. For the reasons which follow, the Court overrules ISOP's objections and accepts and adopts the Magistrate Judge's report and recommendation.

## PROCEDURAL HISTORY

This Court's jurisdiction was invoked by the parties' diversity of citizenship. In its complaint, Sherwin–Williams asserts that ISOP issued an "all risks" insurance policy to it which was in full force and effect from December 22 to December 24, 1989. On those dates, real and personal property owned by Sherwin–Williams' wholly-owned subsidiary in Panama City, Panama, was damaged or lost "due to incidents of theft and vandalism." Sherwin–Williams claims it provided ISOP with proof of loss, but ISOP rejected its claim based on the "other insurance" and "war exclusion" clauses of the policy. Sherwin–Williams therefore requests a declaratory judgment that (1) the policy was in full force and effect and was applicable to the loss, (2) Sherwin–Williams complied with the policy requirements for providing proof of loss, (3) ISOP is required to provide coverage (despite the other insurance clause) if other insurers have denied coverage under their policies, and (4) Sherwin–Williams is entitled to recover $875,-257.00 plus interest at the rate of ten percent (10%) per annum under the policy.

In its answer, ISOP admits the policy was in full force and effect at the time of the loss, but denies the remainder of plaintiff's claims. ISOP also asserts Sherwin–Williams' claims were excluded from coverage under the policy.

Both parties have moved for summary judgment on the question whether Sherwin–Williams' loss was covered by the policy, and whether the loss was excluded from coverage. For the reasons which follow, the Court finds there is no genuine issue of material fact with respect to these issues, and Sherwin–Williams is entitled to judgment as a matter of law.

## FACTS

The following facts are not disputed. On December 15, 1989, the Panamanian National Assembly declared that a state of war existed between the United States and Panama. United States military forces invaded the Republic of Panama on December 20, 1989. In the days following the invasion, Sherwin–Williams' plant in Panama and a number of its retail outlets in Panama City were ransacked and partially destroyed by civilian looters. These properties were owned by Sherwin–Williams de Panama, S.A., a wholly-owned subsidiary of The Sherwin–Williams Company. Sherwin–Williams' business was interrupted as a result of the damage to and loss of its property.

Sherwin–Williams and its affiliated, subsidiary, and associated companies are named insureds in an "all risks" policy issued by ISOP which was first effective January 1, 1988. The policy was renewed effective January 1, 1989, and was in effect at the time of the invasion and subsequent looting. The policy provided worldwide territorial coverage, with stated exceptions not relevant here. The policy consisted of three parts, (1) a policy jacket, (2) a manuscript policy, and (3) Endorsement 1. Because the dispute here is entirely focussed on the policy language, the Court will examine that language at length.

Section 7A of the manuscript policy states that the policy covers "the interest of the insured in all real and personal property, including improvements and betterments, owned, used or intended for use by the insured," "except as hereinafter excluded." Sections 7B and 7C provide coverage for business interruption losses under certain circumstances. Section 8 provides that the policy insures against "all risk of physical

loss or damage to property described herein ... except as hereafter excluded."

ISOP claims coverage is excluded by the War Exclusion. The War Exclusion appears on the policy jacket and in the manuscript policy. The policy jacket states:

War Exclusion Clause  This insurance does not cover any loss or damage occasioned by or through or in consequence, directly or indirectly, of any of the following occurrences, namely:—[sic]

a) War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war.

b) Mutiny, riot, military or popular rising, insurrection, rebellion, revolution, military or usurped power, martial law or state of siege or any of the events or causes which determine the proclamation or maintenance of martial law or state of siege.

Any loss or damage happening during the existence of abnormal conditions (whether physical or otherwise) which are occasioned by or through or in consequence, directly or indirectly, of any of the said occurrences shall be deemed to be loss or damage which is not covered by this insurance, except to the extent that the insured shall prove that such loss or damage happened independently of the existence of such abnormal conditions.

In any action, suit or other proceeding where the Company alleges that by reason of the provisions of this condition any loss or damage is not covered by this insurance, the burden of proving that such loss or damage is covered shall be upon the Assured.

In addition, the manuscript policy also contains a war exclusion clause:

9. *Perils Excluded*

This policy does not insure:

A. Loss or damage occasioned by or through or in consequence, directly or indirectly, of any of the following occurrences, namely:

(1) War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war.

(2) Mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power.

(3) Acts of terrorism committed by a person or persons acting on behalf of or in connection with any organization. For the purpose of this condition, "terrorism" means the use of violence for political ends and includes any use of violence for the purpose of putting the public or any section of the public in fear.

(4) In any action, suit or other proceeding, where the Company alleges that by reason of the provisions of this condition any loss or damage is not covered by this insurance, the burden of proving that such loss or damage is covered shall be upon the insured.

Under the terms of Endorsement No. 1, Sherwin–Williams "bought back" a portion of the excluded coverage. Endorsement No. 1 provides:

1.  It is understood and agreed that coverage provided by this policy is extended, for a limit of liability of $5,000,000 per occurrence, to provide coverage for direct physical loss or damage as a result of the following named perils:

A) Mutiny, civil commotion assuming the proportions of or amounting to a public uprising, military rising, insurrection, rebellion, revolution, military or usurped power including all happenings which contributed to same event;

B) This policy is further extended to include acts of terrirosm [sic] committed by a person or persons acting on behalf of or in connection with any organization. For the purpose of this coverage, terrorism means the use of violence for political ends and includes any use of violence which places the public or any section of the public in fear.

### LAW AND ANALYSIS

A. *Applicable Law*

In her report and recommended decision, Magistrate Judge Hemann first applied Ohio's choice of law rules and determined

that Ohio law governed this diversity case. Neither party has objected to this determination, and the Court accepts and adopts it.

Ohio courts have adopted § 188 of the Restatement (Second) of Conflict of Laws (1971) to discern the law applicable to a case involving a contract. *Gries Sports Enter., Inc. v. Modell,* 15 Ohio St.3d 284, syllabus, 473 N.E.2d 807 (1984). The Magistrate Judge's thorough review of the factors listed in § 188 indicates that Ohio law applies here. The contract of insurance was made in Ohio, Sherwin–Williams' application for insurance was made here, the policy was delivered here, and premium payments were made from here. In addition, the insured's principal place of business is in Ohio, as is its broker. The contract was negotiated in both Ohio and New York, and apparently was to be "performed" worldwide. The Magistrate Judge correctly concluded that Ohio has the most significant relationship to this contract, and Ohio law therefore should apply.

### B. *Ohio Law Regarding Construction of Insurance Policies*

■ Under Ohio law, the "fundamental goal" of interpreting an insurance policy (or any contract) is "to ascertain the intent of the parties from a reading of the contract in its entirety, and to settle upon a reasonable interpretation of any disputed terms in a manner calculated to give the agreement its intended effect." *Burris v. Grange Mut. Cos.,* 46 Ohio St.3d 84, 89, 545 N.E.2d 83, 88 (1989). Words must be given their plain and ordinary meaning. If the words are ambiguous and susceptible of more than one interpretation, the policy language must be liberally construed in favor of the insured. *Dairyland Ins. Co. v. Finch,* 32 Ohio St.3d 360, 513 N.E.2d 1324 (1987).

■ When exclusions from coverage are written into an insurance contract, " 'a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof.' " *King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208, 214, 519 N.E.2d 1380, 1386 (1988).

### C. *Application of Ohio Law to the ISOP Policy*

#### 1. *Coverage under the Policy.*

In this case, the terms of the policy provide coverage for all risks unless those risks are expressly excluded from coverage. Therefore, the Court must begin with the assumption that Sherwin–Williams' losses are covered by the policy.

#### 2. *Burden of Proof Under the Policy.*

■ When ISOP asserted that the war exclusion precluded coverage of Sherwin–Williams' losses, the burden of proof shifted to Sherwin–Williams to demonstrate that its loss was covered. It could do this either by showing that the war exclusion did not apply, or by showing that some other provision of the policy provided coverage.

#### 3. *Applicability of War Exclusion.*

■ Magistrate Judge Hemann determined, and neither party disputes, that the war exclusion excluded Sherwin–Williams' losses from coverage because those losses were indirectly caused by a war or invasion. Sherwin–Williams asserted that the war exclusion did not apply because the U.S. invasion did not "mechanically cause" the looting and vandalism of its stores and plant. This assertion is true but irrelevant because the contractual language to which the parties agreed unambiguously extends beyond direct, mechanical causation, and excludes coverage for "loss or damage occasioned ... *in consequence, directly or indirectly, of* ... war, invasion,...." Therefore, the Court agrees with Magistrate Judge Hemann that the war exclusion excludes coverage for Sherwin–Williams' losses.

#### 4. *Endorsement No. 1.*

Endorsement No. 1 "bought back" a portion of the coverage excluded by the war exclusion. Endorsement No. 1 extends "coverage for direct physical loss or damage as a result of ... civil commotion assuming the proportions of or amounting to a public uprising, ... including all happenings which contributed to same events." The question, therefore, is whether the looting in Panama

City was a "civil commotion" amounting to a "public uprising."

*Civil Commotion.* Magistrate Judge Hemann determined that the term "civil commotion" means a "temporary, primarily civilian disturbance, of a degree greater than a riot, but less than armed insurrection, wherein the civil peace is disrupted by violence and/or acts of civil disorder." She concluded that the term encompassed the vandalism and looting of Sherwin–Williams' property, because the participants in the civil disruption in Panama after the invasion were overwhelmingly civilians, and the disruption was domestic, not military, in nature.

Magistrate Judge Hemann further concluded that the commotion "assum[ed] the proportions of or amount[ed] to a public uprising," because, by ISOP's own description, "there was a complete breakdown of law and order in Panama City, and looting, restrained only by property owners who had the private means to protect themselves, engulfed the city for several days."

ISOP objects to the Magistrate Judge's determination that the looting in Panama City was a "civil commotion." ISOP first asserts that "civil commotion" connotes a purely local, purely domestic disturbance. Because the events in Panama City were provoked by a foreign invasion which resulted in a lack of local police protection, ISOP contends that these events were not purely local and domestic.

■ The Court disagrees. Sherwin–Williams' damage was caused by looting and vandalism. The looting and vandalism was a purely local, domestic, civilian event, even if it was remotely "caused" by the U.S. invasion. Endorsement No. 1 provides coverage for civil commotion *"including all happenings which contributed to same event."* If ISOP wanted to exclude coverage for civil commotion provoked by war or invasion, it could have done so. *Cf. Wilker Bros. Co. v. Lumbermans Mutual Casualty Co.,* 529 F.Supp. 113, 116 (S.D.N.Y.1981) (policy excluded coverage for warlike operations and civil strife arising therefrom).

ISOP claims that it did exclude such coverage in the war exclusion. But to the extent that the war exclusion and Endorsement No. 1 may conflict in this respect, Endorsement No. 1 has precedence. Because this is an all risks policy (which provides coverage for all risks unless they are excluded), Endorsement No. 1 would have been unnecessary if the war exclusion had not excluded coverage for "civil commotion" in the first place. If the intent of Endorsement No. 1 was simply to delete the *exclusion* for civil commotion, the parties could have done so. Instead, they added express *coverage* for civil commotion. They thus increased coverage beyond what it would have been if civil commotion had never been excluded, providing coverage for "civil commotions" and "all happenings which contributed to same event," even if that happening was war or invasion.

■ *Public Uprising.* ISOP also argues that the events in Panama City did not assume the proportions of or amount to a "public uprising," because that term connotes an element of political revolt which was not present here. Again, the Court disagrees. The "public uprising" language in the policy defines the extent or magnitude of the "civil commotion," not its nature. The commonly accepted meaning of the term "civil commotion" does not include any political element. Rather, that term " 'import[s] occasional local or temporary outbreaks of unlawful violence.' " *Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1019 (2d Cir.1974) (*quoting* 11 G. Couch, Cyclopedia of Insurance Law 42:487 (2d ed. 1963)). The addition of the term *"public* uprising" to define the magnitude of the outbreaks does not add a *political* element.

## CONCLUSION

For the foregoing reasons, the Court declares that the Endorsement No. 1 of the ISOP policy provided coverage for Sherwin–Williams' losses. The following questions remain for the court to determine: (1) whether Sherwin–Williams provided proper proof of loss to ISOP, (2) whether the other insurance clause precluded coverage of Sherwin–Williams' losses, and (3) the amount of Sherwin–Williams' loss. Accordingly, the case will proceed to trial on these issues.

## REPORT AND RECOMMENDATION

PATRICIA A. HEMANN, United States Magistrate Judge.

This matter is before the magistrate judge pursuant to an order of reference issued by Chief Judge Lambros on May 12, 1993. Plaintiff's cause of action is a complaint for declaratory judgment on an insurance contract. Pending are cross motions for summary judgment. Jurisdiction over the action is based on diversity of citizenship. 28 U.S.C. § 1332(a) and 28 U.S.C. § 2201. For the reasons set forth below, the magistrate judge recommends that plaintiff's motion for summary judgment be granted and that defendant's motion for summary judgment be denied.

## I. FACTUAL BACKGROUND

Plaintiff, the Sherwin–Williams Company ("Sherwin–Williams"), purchased an "all risk" insurance policy with worldwide territorial coverage (SP No. IF–7520499) ("the policy") from defendant, The Insurance Company of the State of Pennsylvania ("ISOP"). The policy contains three components, the "policy jacket," the manuscript policy and Endorsement 1. The effective date of the policy was January 1, 1988. The policy was renewed on its anniversary date in 1989 and was in effect during the period of the alleged covered loss, December 22–24, 1989. The policy was written to cover all risks of loss and physical damage unless specifically excluded.

Military forces of the United States invaded the Republic of Panama during the early morning hours of December 20, 1989.[1] Chaos reigned throughout Panama during the days following the initial military operation. During this period of time, the Sherwin–Williams plant in Panama, as well a number of its retail outlets in residential areas of Panama City, were ransacked, plundered and partially destroyed by civilian looters. The plant and stores were owned by Sherwin–Williams de Panama, S.A., a wholly-owned subsidiary of the Sherwin–Williams Company and a named insured under the ISOP policy.

Sherwin–Williams suffered damage and loss to its real and personal property as a result of the aforementioned incidents. Plaintiff also suffered loss due to business interruption resulting from damage to and loss of property. Plaintiff filed a written notice of property loss on December 28, 1989. Shortly thereafter, and with supplements that followed, plaintiff provided defendant with proof of loss documentation. The defendant "conditionally rejected" plaintiff's claim on April 20, 1990 and did so "finally" on January 30, 1991.

Defendant rejected the claim as premature pending the settlement of plaintiff's claims for the same losses against local insurance carriers in the Republic of Panama. Pursuant to paragraph 20 of the manuscript policy, claims covered by other insurance were not considered covered by the ISOP policy:

20. *Other Insurance*

Except for insurance described by the contributing insurance clause, by the excess insurance clause, or by the underlying insurance clause, this policy shall not cover to the extent of any other insurance, whether prior or subsequent hereto in date, and whether directly or indirectly covering the same property against the same perils. This insurer shall be liable for loss or damage only to the extent of that amount in excess of the amount recoverable from such other insurance.

Additionally, and notwithstanding the issue of other coverage, defendant rejected plaintiff's claim as "excluded or otherwise not covered" under the "war exclusion" clauses of the "conditions" section of the policy jacket, paragraph 9 of the manuscript policy, and paragraphs 1(a) and 1(b) of Endorsement 1 ("the Endorsement"). Defendant made the determination that plaintiff failed to carry its "reverse burden of proof" (paragraph 9(A)(4) of the manuscript policy) with respect to coverage under the war exclusion clauses. Defendant also asserted that the "reverse burden of proof" language applied to Endorsement 1. In relevant parts, the provisions are reproduced below:

---

**1.** On December 15, 1989, the Panamanian National Assembly declared that a state of war existed between the United States and the Republic of Panama.

## CONDITIONS

*War Exclusion Clause*

This insurance does not cover any loss or damage occasioned by or through or in consequence, directly or indirectly, of any of the following occurrences, namely:

a) War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war.

b) Mutiny, riot, military or popular rising, insurrection, rebellion, revolution, military or usurped power, martial law or state of siege or any of the events or causes which determine the proclamation or maintenance of martial law or state of siege.

Any loss or damage happening during the existence of abnormal conditions (whether physical or otherwise) which are occasioned by or through or in consequence, directly or indirectly, of any of the said occurrences shall be deemed to be loss or damage which is not covered by this insurance, except to the extent that the insured shall prove that such loss or damage happened independently of the existence of such abnormal conditions.

In any action, suit or other proceeding where the Company alleges that by reason of the provisions of this condition any loss or damage is not covered by this insurance, the burden of proving that such loss or damage is covered shall be upon the Assured.

## MANUSCRIPT POLICY

9. *Perils Excluded*

This policy does not insure:

A. Loss or damage occasioned by or through or in consequence, directly or indirectly, of any of the following occurrences, namely:

(1) War, invasion, acts of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war.

(2) Mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power.

(3) Acts of terrorism committed by a person or person acting on behalf of or in connection with any organization. For the purpose of this condition, "terrorism" means the use of violence for political ends and includes any use of violence for the purpose of putting the public or any section of the public in fear.

(4) In any action, suit or other proceeding, where the Company alleges that by reason of the provisions of this condition any loss or damage is not covered by this insurance, the burden of proving that such loss or damage is covered shall be upon the insured.

## Endorsement NO. 1

1. It is understood and agreed that coverage provided by this policy is extended, for a limit of liability of $5,000,000 per occurrence, to provide coverage for direct physical loss or damage as a result of the following named perils:

(a) Mutiny, civil commotion assuming the proportions of or amounting to a public uprising, military rising, insurrection, rebellion, revolution, military or usurped power including all happenings which contributed to same event;

(b) This policy is further extended to include acts of terrirosm [sic] committed by a person or person acting on behalf of or in connection with any organization. For the purpose of this coverage, terrorism means the use of violence for political ends and includes any use of violence which places the public or any section of the public in fear.

2. The limit of liability stated herein is in excess of the policy deductible.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as hereinabove set forth.

5. All other terms and conditions of the policy to which this Endorsement is attached, remain the same.

All risk insurance covers all sources of loss or damage unless explicitly excluded. In the absence of exclusions or endorsements which modify a "pure" all risk policy, any property

loss or damage would be covered. A number of exclusions are listed in the policy before the court. However, under the terms of Endorsement 1, the plaintiff "bought back" some of the coverage excluded in the manuscript policy. Paragraph 8 of the manuscript policy states:

> This policy insures against all risk of physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered hereunder, *except as hereafter excluded.*

At issue is whether the all-risk policy issued by defendant excludes coverage for the type of loss Sherwin–Williams suffered at its Republic of Panama plant and stores during the period December 22–24, 1989.

## II. LEGAL ISSUES

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553. In this way summary judgment can be used to dispose of claims and defenses which are factually unsupported. *Id.* at 324, 106 S.Ct. at 2553. The burden on the nonmoving party is to show, through the use of evidentiary materials, the existence of a material fact which must be tried. *Id.* The court's inquiry at the summary judgment stage is "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511.

The parties are in agreement that this matter is appropriate for decision on the pending motions.

### B. CHOICE OF LAW

A federal court hearing a diversity of citizenship case must apply the conflict of law rules of the state in which it sits. See *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 494, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *National Union Fire Ins. Co. v. Watts,* 963 F.2d 148 (6th Cir.1992); *Colonial Refrigerated Transportation, Inc. v. Worsham,* 705 F.2d 821, 825 (6th Cir.1983).

Ohio follows the general principle that the law of the state where the contract is made governs its interpretation. *Nationwide Mutual Insurance Co. v. Ferrin,* 21 Ohio St.3d 43, 44, 487 N.E.2d 568, 569 (1986); *Garlick v. McFarland,* 159 Ohio St. 539, 545, 113 N.E.2d 92, 95 (1953). To aid in determining the state in which the contract was made, Ohio has adopted the principles of § 188 of the *Restatement (Second) Conflict of Laws* (1971) ("*Restatement (Second)*"). *Gries Sports Enterprises, Inc. v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985).

Under *Restatement (Second)* principles, the "state where the contract was made" is essentially synonymous with the state with the "most significant relationship" to the contract. *Restatement (Second)* § 188, Comment on Subsection (2):e. The syllabus in *Gries v. Modell* sets forth the first step in determining the state with the most significant contact to the contract:[2]

---

**2.** Although *Gries v. Modell* does not expressly say so, the adoption of § 188 of the *Restatement (Second)* necessarily implies the adoption of the principles of § 6 of the *Restatement (Second).* The principles of § 6 "underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the transaction, and the parties." *National Union Fire Insurance v. Watts,* No. 89–CV–65, 1991 WL 337314, *6, 1991 U.S.Dist. LEXIS 20194, at *14 (N.D.Ohio Jan. 7, 1991), *aff'd,* 963 F.2d 148 (6th Cir.1992). In short, the five contacts listed in § 188 cannot be read in isolation. Although the

In the absence of an effective choice of law by the parties, the contacts to be taken into account to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and,

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Syllabus at ¶ 1.

Applying the principles of *Restatement (Second)* § 188(2)(a)–(e) to the facts of the case, Ohio is determined to be the "place of contracting." Applications for insurance were made in Ohio. The policy was delivered to Sherwin–Williams in Ohio. Premium payments were made by Sherwin–Williams from Ohio.

An early Ohio case held:

It is a New York corporation; the policies were issued in New York. The facts are that the applications were made here, and the policies were *delivered* here, the *premiums were all paid here,* and we think (under authority of the case of *Cross v. Armstrong,* 44 Ohio St. 613, 622, 10 N.E. 160 (1887)) that this is an Ohio contract, to be governed by the laws of Ohio.

*Plaut v. Mutual Life Ins. Co.,* 4 Ohio Cir.Ct., N.S., 94, *aff'd,* 65 Ohio St. 586, 63 N.E. 1132 (1899) (emphasis added). The District Court for the Northern District of Ohio, interpreting Ohio law, has held that "the state in which the application is made and accepted and the policy delivered is the place where the contract is entered into." *Baltimore &*

*O. R. Co. v. Reaux,* 59 F.Supp. 969, 973 (N.D.Ohio 1945).

Most of the other criteria set forth in the *Restatement (Second)* are not determinative here. Negotiations took place in Ohio and New York via telephone conversations and facsimile transmissions. The site of negotiation is thus not helpful in determining the law of this case. Further, "performance" in the context of an insurance contract cannot be as specific as it would be, for instance, in a contract for the manufacture of widgets. Similarly, the location of the subject matter is uncertain inasmuch as the contract in question covers the world (excepting a small number of named countries).

The principal place of business of Sherwin–Williams is Ohio. A corporation's place of business is more important, for most issues, than the state of its incorporation. *Restatement (Second),* § 188, Comment on Subsection (2):e at 581. The office of the broker negotiating the terms of the contract for Sherwin–Williams is located in Ohio.

Based on the above, Ohio, in comparison with New York or Pennsylvania, has the most significant relationship with this contract.

Even if the choice of substantive law were not clear under the contractual principles of § 188 alone, the decision that Ohio substantive law applies would follow from an application of § 6 principles.[3] Ohio is interested in protecting the expectations of its corporations. Thus Ohio, rather than New York, is concerned with enforcing contracts to which one of its residents is a party. New York, on the other hand, is merely the site of defendant's underwriter. It has little relationship to either party and little relationship to the

§ 188 factors were dispositive in *Gries v. Modell* and *Ferrin,* such is not always the case. When they are not dispositive, the court must turn to an analysis guided by § 6.

**3.** § 6 of the *Restatement (Second) Conflict of Laws* reads as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability, and uniformity of result; and

(g) ease in the determination and applicability of the law to be applied.

contract itself. There is simply no interest served in looking to New York law under these circumstances.

## C. CONSTRUCTION OF INSURANCE CONTRACTS UNDER OHIO LAW

The law of Ohio is well-settled with respect to interpreting insurance contracts. When the terms in an insurance policy are not explicitly defined, they are "given their natural and commonly accepted meaning, where they in fact possess such meaning, to the end that a reasonable interpretation of the insurance contract consistent with the apparent object and plain intent of the parties may be determined." *Gomolka v. State Auto Mut. Ins. Co.*, 70 Ohio St.2d 166, 167–168, 436 N.E.2d 1347, 1348 (1982).

To determine the "plain meaning of an insurance contract, the contract should be read as a whole and each word given its appropriate meaning, if possible." *Burdett Oxygen Co. v. Employers Surplus Lines Ins. Co.*, 419 F.2d 247, 248 (6th Cir.1969), *citing, Farmers' Nat. Bank v. Delaware Ins. Co.*, 83 Ohio St. 309, 337, 94 N.E. 834, 839 (1911). If the policy remains ambiguous after determining the plain meaning of the terms used, "it is to be liberally construed in favor of the insured." *Fuerstenberg v. Mowell*, 63 Ohio App.2d 120, 122, 409 N.E.2d 1035, 1036 (1978). This rule of construction is not applicable, however, when the terms are clear and unambiguous, *id.*, if applying the terms "would provide an unreasonable or forced interpretation," *Bright v. Ohio Casualty Ins. Co.*, 444 F.2d 1341, 1343 (6th Cir.1971), *citing, Morfoot v. Stake*, 174 Ohio St. 506, 507, 190 N.E.2d 573, 574 (1963), or if the interpretation of ambiguous terms "would result in an extension of coverage," *West v. McNamara*, 159 Ohio St. 187, 197, 111 N.E.2d 909, 913 (1953).

The fundamental rule of construction remains, however, that "the goal in insurance policy interpretation is to ascertain the intent of the parties from a reading of the contract in its entirety, and to settle upon a reasonable interpretation of any disputed terms in a manner calculated to give the agreement its intended effect." *Burris v. Grange Mut. Cos.*, 46 Ohio St.3d 84, 89, 545 N.E.2d 83, 85

(1989). Thus, "where the words used in a policy of insurance have a plain and ordinary meaning, it is neither necessary nor permissible to resort to construction ..." *Olmstead v. Lumbermens Mut. Ins. Co.* 22 Ohio St.2d 212, 216, 259 N.E.2d 123, 126 (1970) (emphasis added). *See also Travelers Indemnity Co. v. Reddick*, 37 Ohio St.2d 119, 121, 308 N.E.2d 454, 456 (1974); *Karabin v. State Auto Mut. Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403, 406 (1984). The court abstains from interpretation when the language of the contract is clear on its face. *Tomlinson v. Skolnik*, 44 Ohio St.3d 11, 12, 540 N.E.2d 716, 717 (1989).

When an insurance policy lists specific exclusions to coverage, the exclusion "must be clear and exact to be given effect," *United States Fire Ins. Co. v. Ohio High School Athletic Assn.*, 71 Ohio App.3d 760, 764, 595 N.E.2d 418, 420 (1991); *Burris v. Grange Mut. Co.*, 46 Ohio St.3d 84, 89, 545 N.E.2d 83, 88 (1989), "or arise by necessary implication from policy language," *Ambrose v. State Farm Fire & Cas.*, 70 Ohio App.3d 797, 800, 592 N.E.2d 868, 870 (1990). When exclusions are written into a policy, "that which is not clearly excluded is included." *Johnston v. Akron Center for Reproductive Health, Inc.*, 68 Ohio App.3d 655, 657, 589 N.E.2d 432, 433 (1990).

In determining whether claims lie within the scope of coverage, the court resolves ambiguities in the insured's favor and any "exclusionary language must be read strictly." *Sherwin–Williams Co. v. Certain Underwriters at Lloyd's London*, 813 F.Supp. 576, 583 (N.D.Ohio 1993). When two provisions in the same policy conflict, "the insurer will be bound by that provision most favorable to the insured." *Boyle v. Great–West Life Assur. Co.*, 27 Ohio App.3d 85, 89, 499 N.E.2d 895, 898 (1985). When more than one reasonable interpretation of the policy is available, the construction favoring coverage is to be adopted. *Ambrose v. State Farm Fire & Cas.*, 70 Ohio App.3d at 800, 592 N.E.2d at 870. In fact, "any reasonable construction of the policy which results in coverage must be adopted by the trial court in Ohio." *Nationwide Mut. Ins. Co. v. Wright*,

70 Ohio App.3d 431, 434, 591 N.E.2d 362, 364 (1990) (emphasis added).

## D. APPLICATION OF OHIO LAW TO THE POLICY

### 1. Manuscript Policy Language

Setting aside for the moment the issue of applicability of language contained in the "policy jacket" and Endorsement 1, it is clear from the plain and ordinary language of Paragraph 9(A)(4) of the manuscript policy that plaintiff bears the burden of proving that loss or damage it suffered in Panama is not foreclosed by the "war exclusion clause."

Under the terms of paragraph 9(A)(1) of the manuscript policy read alone, loss and damage is not covered when "occasioned by or through or in consequence, directly or indirectly, of any of the following occurrences, namely: war, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war." Manuscript Policy ¶ 9 at 13.

By any reasonable definition, the military actions undertaken by the United States in the Republic of Panama during December, 1989 constituted "war or invasion." Accordingly, the loss to plaintiff's plant and stores which was "occasioned by or through or in consequence, directly or indirectly" by the "war or invasion" would be excluded under paragraph 9 of the manuscript policy.

While it is true that the losses suffered by plaintiff may not have been directly or "mechanically" caused by military activities, the clear and unambiguous causation language of the manuscript policy excludes loss or damage "occasioned by or through or in consequence, directly or indirectly, of any of the following occurrences, ... war, invasion, civil war...." The language of the manuscript policy "perils excluded" section, given its ordinary, natural and commonly accepted meaning, unambiguously extends the net of causation such that damage and loss which is "occasioned by or through or in consequence, directly or indirectly, of ... a war or invasion" is excluded. It is undisputed that there would be an increased probability of looting and theft following major social disruptions such as war or invasion.

Plaintiff's contention that case law construing theories of causation under New York law (or Ohio for that matter) requires "mechanical causation" in the present context ignores the preeminent tenet of Ohio contract interpretation. Absent a violation of public policy, fraud or duress, it is not necessary, and in fact impermissible, to go beyond the four corners of an agreement when the intent of the parties can be unambiguously discerned. *Nat. Union Fire Ins. Co. v. Shane and Shane Co.,* 78 Ohio App.3d 765, 769, 605 N.E.2d 1325, 1328 (1992). Plaintiff, having read, understood and signed the contract, cannot protest a harsh result which could have been anticipated from language it agreed to.

Military actions undertaken by the United States during the invasion of Panama did not "mechanically cause" the theft and vandalism of plaintiff's stores. Nevertheless, it would be disingenuous to assert that the invasion and the civil disruption it entailed did not "occasion" or "indirectly" lead to, as those words are commonly understood to mean, the widespread looting that occurred. When contractual language agreed to by the contracting parties unambiguously extends causation beyond a direct or "mechanical" cause, the language is binding. As the court noted in *Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1007 (2nd Cir.1974),

> These cases establish a mechanical test of proximate causation for insurance cases, a test that looks only to the 'causes nearest to the loss.' This rule is adumbrated by the maxim contra proferentem: if the insurer desires to have more remote causes determine the scope of exclusion, *he may draft language to effectuate that desire.*

*Pan Am,* 505 F.2d at 1007 (citations omitted) (emphasis added).

### 2. Endorsement 1 Language

The manuscript policy does not stand alone, however. Sherwin–Williams purchased Endorsement 1 for an additional cost of $6,000 above the basic premium. The Endorsement "bought back" a portion of the coverage excluded from "all risk" by opera-

tion of paragraph 9 of the manuscript policy. Endorsement 1 is

> *"extended,* for a limit of liability of $5,000,000 per occurrence, ... coverage for direct physical loss or damage as a result of the following named perils: mutiny, civil commotion assuming the proportions of or amounting to a public uprising, military rising, insurrection, rebellion, revolution, military or usurped power *including all happenings which contributed to same event."*

(Emphasis added.)

### a. Plaintiff's loss and damage directly resulted from "civil commotion."

The affidavits and depositions establish that most, if not all, of the theft and damage to plaintiff's facilities was the result of civilian action. *See, e.g.,* affidavits of Jesus Miguens Sanchez, Antonio Gullen Pimentel, Ivan Antonio Broce; depositions of Ismael Perez at 23, James Martin Keagle at 64–69.

What happened in and around Panama City in the days following the December 20, 1989 American invasion must be characterized as a state of civil commotion. The natural, ordinary and commonly accepted meaning of the term "civil commotion" would encompass widespread acts of looting by civilians occurring over a period of days.

The phrase "civil commotion" has not been defined in Ohio insurance contract interpretation cases. The court is free then to look to other jurisdictions for help in ascertaining the meaning of the phrase, but is not bound by their determinations. In *Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 368 F.Supp. 1098 (S.D.N.Y.1973), the court found that civil commotion referred to "a situation similar to a riot but involving either a more serious disturbance or one that is part of a broader series of disturbances." *Id.* at 1136. The Court of Appeals for the Second Circuit, hearing *Pan Am* on appeal, noted that insurance authorities were in agreement that civil commotion denoted perils of a local nature. *Pan Am,* 505 F.2d 989, 1019. Moreover, the term "civil commotion" 'import[s] occasional local or temporary outbreaks of unlawful violence.' Riots and civil commotion are purely 'domestic disturbances.' There is no authority for the proposition that riots or civil commotion are other than local, domestic disturbances. *Id.* (citations omitted). In *Hartford Fire Ins. Co. v. War Eagle Coal Co.,* 295 F. 663, 665 (4th Cir.1924) (*quoting,* 11 *Corpus Juris* 794), the court adopted the following definition of "civil disturbance:"

> An uprising among a mass of people which occasions a serious and prolonged disturbance and an infraction of civil order, not attaining the status of war or an armed insurrection. A civil commotion requires the wild or irregular action of many persons assembled together.

The common and generally accepted meaning of "civil commotion" would not be appreciably modified by the definitions adopted by the Second or Fourth Circuits. In essence, those definitions refer to a temporary, primarily civilian disturbance, of a degree greater than a riot but less than armed insurrection, wherein the civil peace is disrupted by violence and/or acts of civil disorder. *Black's Law Dictionary* at 252 (5th ed. 1979) defines *commotion* as

> A condition of turmoil, civil unrest or insurrection. A civil commotion is an uprising among a mass of people which occasions a serious and prolonged disturbance and infraction of civil order not attaining the status of war or an armed insurrection; it is a wild and irregular action of many persons assembled together.

Nearly any definition used by this court to determine the parties' intent with respect to "civil commotion"—whether it be the natural and ordinary meaning used in everyday discourse, *Black's Law Dictionary* definition, or one of the constructions adopted in the Fourth or Seventh Circuit—would surely encompass acts of widespread looting similar to what was observed in Panama City after the December, 1989 invasion.

The American military operation undoubtedly contributed to the pervasive civil disruption observed in Panama City. According to eye-witness testimony, however, the participants were themselves overwhelmingly civilian. One expert hypothesized, and reports

personally observing, that some proportion of the domestic disturbance was initiated by members of Noreiga's Dignity Battalions as part of a "scorched earth" campaign undertaken in response to the invasion. Deposition of Antonio Bonilla at 66–72. This "military action," could its scope be determined, would take the damage caused by the particular group of "dignity battalion" members out of the scope of Endorsement 1. To the extent that their actions could be shown to be directly "military," the consequent loss or damage would be excluded under paragraph 9 of the manuscript policy. However, ISOP has not sustained its burden of offering evidence which would permit apportionment of damages and, in fact, cannot be said to have given any emphasis to this position.

The fact remains that the overwhelming majority of those taking part in the disturbances were ordinary civilians. The domestic flavor of the civilian disruption following the invasion was never compromised. The disturbances, as a result, were never outside the scope of a "civil commotion."

### b. The magnitude of civil commotion present invoked the Endorsement.

A plain reading of Endorsement 1 suggests that the "amount" or "degree" of civil commotion required to invoke clause 1(a) of Endorsement 1 must be "civil commotion *assuming the proportions of or amounting to* a public uprising." The magnitude of the civil commotion committed by Panamanian civilians following the American invasion was clearly of a degree "assuming the proportions of or amounting to a public uprising, . . . ." Defendant's own characterization of fallout arising from the invasion is descriptive of the events:

> As a result of the massive assault and corresponding destruction of the PDF, there was a complete breakdown of law and order in Panama City, and looting, restrained only by property owners who

had the private means to protect themselves, engulfed the city for several days after the initial invasion.

Defendant's Brief at 1.

### c. The civil commotion is covered by the Endorsement even if "occasioned by or through, or in consequence, directly or indirectly" of a war or invasion.

The clear and unambiguous language of the Endorsement covers "direct physical losses as a result of . . . civil commotion . . . *including all happenings which contributed to same event.*" Under the plain terms of the Endorsement, direct physical loss or damage as a result of civil commotion is covered *regardless of its origins,* i.e., whether the civil commotion results from foreign military invasion, a hurricane, or political chicanery.[4] As a result of this very broad causation language ("contributed to"), Endorsement 1 "buys back" *not only* the civil commotion excluded in paragraph 9(A)2 but that portion of the remaining "war exclusion clause" which excludes loss and damage resulting from civil commotion *when the civil commotion was "occasioned by or through or in consequence, directly or indirectly" of war or invasion.*

The language of Endorsement 1 carves out an exception to the "war risk" portion of paragraph 9 of the manuscript policy whenever one of the "happenings" in the phrase "including all happenings which contributed to same event" is a "war or invasion." By placing such all-encompassing causation language in the civil commotion portion of the Endorsement, the insurers limited the "war and invasion" portion of the "perils excluded" component of the manuscript policy.

The "perils excluded" clause of the manuscript policy thus is modified to the extent that language in the Endorsement conflicts with it. The Endorsement states "nothing herein contained shall be held to vary, alter,

---

4. ISOP appears to argue that "direct and indirect" physical loss is excluded under paragraph 9 of the manuscript policy (for the perils listed) but only "direct" physical loss is "bought back" under Endorsement 1. The words "directly" and "indirectly," however, are not used in analogous ways in the two contract provisions. In paragraph 9 the words are used as adverbs which modify the way loss or damage was "occasioned," what it was "in consequence" of, or whether the loss was "through" an excluded peril. In contrast, the word "direct" as used in the Endorsement is an adjective and modifies the phrase "physical damage." See Deposition of Patricia May at 149.

waive or change any of the terms, limits or conditions of the policy, except as *herein above set forth."* (Emphasis added.) Paragraph 5 of Endorsement 1 states: "All *other terms and conditions* of the policy to which this Endorsement is attached, remain the same." (Emphasis added.)

The only reasonable meaning of the phrase "herein above set forth" and the language of paragraph 5, read together, is that the parties intended and agreed to modify the "perils excluded" language of the manuscript policy so as to cover direct loss resulting from "civil commotion . . . assuming the proportion of or amounting to . . . rebellion . . . including *all happenings* which contributed to same event," *even when* one of the "happenings" was a "war or invasion" which "occasioned, . . . directly or indirectly" the civil commotion.

Sherwin–Williams would not have paid a 25% supplement to its basic premium in exchange for no additional protection. Similarly, ISOP cannot argue that the Endorsement does not modify the corresponding sections of the manuscript policy or policy jacket when the provisions conflict. Such an argument would render the Endorsement meaningless. Moreover, it would not be in accord with well settled Ohio law holding that an endorsement will take precedence over the basic insurance policy. *American Hardware Mut. Ins. Co. v. Mansfield Auto Truck Plaza,* 15 Ohio St.3d 367, 474 N.E.2d 310 (1984).

Because of its critical impact on the analysis and recommendation of the magistrate judge, a summary of the relationship of Endorsement 1 to the manuscript policy is in order. All risk policies cover "all risks" except those explicitly excluded. The language of paragraph 9 of the manuscript policy sets forth a number of excluded perils. As a result of the expansive causation language in the introductory sentence of paragraph 9, any loss or damage that occurs is excluded if it was "occasioned by or through or in consequence, directly or indirectly" of any of the named perils.

Endorsement 1 carves out exceptions to the exclusionary language of paragraph 9. The Endorsement explicitly covers "direct physical loss or damage" as a result of "civil commotion" and "terrorism." Implicitly, the Endorsement *also* cuts into the "war exclusion" clause. The Endorsement covers "civil commotion" regardless of the cause, *even if the cause was a war or invasion.* Had the defendants wanted to maintain the complete exclusion of any loss or damage "occasioned by or through or in consequence, directly or indirectly, of . . . war of invasion," they could have done so. They could have drafted Endorsement 1 so that it did not alter or conflict with the war exclusion clause. For instance, they could have stated, "direct loss or damage is covered if a result of civil commotion, including all happenings which contributed to same event, *except civil commotion occasioned by or through or in consequence, directly or indirectly, of a war or invasion."* ISOP did not draft the policy with this restrictive language.

The contract contains no provision which incorporates the "reverse burden of proof" language of paragraph 9 of the manuscript policy into Endorsement 1. Had ISOP wanted the "reverse burden of proof" language to apply to Endorsement 1, they could have easily and unambiguously written it in. Having failed to do so, the burden of proof for denying coverage under Endorsement 1 lies with defendants.

### 3. "Policy Jacket" Language

The wording of the "policy jacket" with respect to the "war exclusion clause" is not identical with the transcript policy. In particular, the following paragraph broadens the scope of exclusion.

Any loss or damage happening during the existence of *abnormal conditions* (whether physical or otherwise) which are occasioned by or through or in consequence, directly or indirectly, or any of the said occurrences shall be deemed to be loss or damage which is not covered by this insurance, except to the extent that the insured shall prove that such loss or damage happened independently of the existence of such abnormal conditions. (emphasis added).

The terms of paragraph 41 of the manuscript policy resolves the dilemma of the

conflicting components of the entire policy package. Paragraph 41 of the manuscript policy states:

41. *Full Waiver*

The terms and conditions of this form are substituted for any part or parts of the policy with which they are or might be at variance.

A common sense reading of the above leads to the conclusion that when there is a conflict in the wording of the manuscript policy and policy jacket, the manuscript policy takes precedence.

Ms. Patricia May, Property Underwriting Supervisor for ISOP, was involved in negotiations that led to the final policy and signed the policy on behalf of ISOP. In her deposition she stated the following with respect to the waiver set forth in paragraph 41 of the manuscript policy:

Q What is paragraph 41? Does it have a catch-all phrase that you use?

A Well, yes, it's a catch-all phrase. It's titled "full waiver," for ease of reference.

Q Why do you use that clause in this type of manuscript policy?

A. To show that any clauses contained in the manuscript *supersede* the clauses in the policy jacket.

Deposition of Patricia May at 173. (emphasis added).

In effect, there is a hierarchy of clauses in this contract. When there is conflict between the different components, the manuscript policy modifies and takes precedence over the policy jacket and the Endorsement modifies and takes precedence over both the manuscript policy and the policy jacket. When in conflict, clauses are binding in the following order: the manuscript policy language takes precedence over the terms of the policy jacket, and the Endorsement takes precedence over both the policy jacket and manuscript policy.

Even if the language of the contract does not make it clear which clauses predominate, Ohio law requires that ambiguity arising from the interpretation of conflicting clauses in an insurance contract be resolved to the benefit of the insured. *Boyle v. Great-West Life Assur. Co.,* 27 Ohio App.3d 85, 499

N.E.2d 895 (1985); *Nationwide Mut. Ins. Co. v. Wright,* 70 Ohio App.3d 431, 591 N.E.2d 362 (1990).

## III. CONCLUSION

The magistrate judge recommends that the following conclusions of law be adopted by the court, that plaintiff's motion for summary judgment be granted and that defendants' motion for summary judgment be overruled:

1. The legal issues of this case are decided pursuant to Ohio law.

2. The policy was in effect throughout the time that loss and damage occurred to plaintiff's physical property.

3. Utilizing the well-settled Ohio law of insurance contract interpretation,

a. Plaintiff's loss is not covered under paragraph 9 of the manuscript policy.

b. Plaintiff's loss is covered under Endorsement 1, paragraph 1(a).

c. Paragraph 41 of the manuscript policy, the "full waiver" provision, establishes that clauses of the manuscript policy supersede those of the policy jacket with which they conflict.

d. Clauses in Endorsement 1 supersede those of the policy jacket and manuscript policy with which they conflict.

e. The burden of proof for demonstrating loss under the war exclusion clause falls to plaintiff.

f. The burden of proof for denying loss under Endorsement 1 lies with defendants. The reverse burden of proof language utilized in paragraph 9(A)(4) is not "written in" to Endorsement 1.

g. Defendants must entertain plaintiff's claims for loss submitted to, but denied under, other "local" policies.

Dated: Oct. 13, 1993.

## OBJECTIONS

Any objections to the Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the

District Court's order. *See also, Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).